UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| DONALD D. BARRETT | ) | |
| | ) | |
| V. | ) | NO. 2:15-CV-259 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's claims for Disability Insurance Benefits and Supplemental Security Income were denied administratively by the defendant following a hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant have filed Motions for Summary Judgment [Docs. 13 and 16].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff is a "younger individual" under the applicable regulations. He has a limited education. There is no dispute that he cannot return to his past relevant work. His medical history, both that which was before the ALJ and which was subsequently presented to the Appeals Council, is set forth in the Commissioner's brief as follows:

> Plaintiff's problems with diabetes, neuropathy, and foot pain pre-date his alleged onset date of June 2012. Records from 1997 indicate that Plaintiff's A1C level was 8.1 (with a reference range of 4.8 to 5.6) (Tr. 371). He was diagnosed with diabetes mellitus, type II, and managed his diabetes with medication over the next several years (Tr. 299-312). He reestablished care with Catherine Raff, F.N.P., in November 2004, after not receiving treatment since March 2002 (Tr. 297-98). His diabetes was uncontrolled and he had been having severe intermittent neuropathy to both of his lower extremities (Tr. 298). He had red spots on the tops of both feet (Tr. 298). Ms. Raff treated Plaintiff's diabetes mellitus with neuropathy and foot pain over the next several years (Tr. 270-90). She prescribed medications, ordered laboratory testing, and instructed Plaintiff to try and change his dietary intake (Tr. 268). She wrote to Plaintiff to explain his test results and to encourage him to perform regular aerobic exercises most days of the week, follow his diet, and meet with the diabetic educator (Tr. 375). Ms. Raff started Plaintiff on insulin in March 2011 (Tr. 267). Plaintiff reported toe discomfort, and physical examination showed decreased sensation over his foot, particularly in his toes (Tr. 267). Ms. Raff told him to get some good inserts for his shoes since he was on his feet a lot (Tr. 267).
> In May 2012, Ms. Raff noted that Plaintiff's diabetes was getting worse, as he had not been taking his medication as prescribed (Tr. 258). Plaintiff also reported pain on the top of his left foot (Tr. 259). Physical examination showed a mildly reduced range of motion (Tr. 260). His left foot and ankle had a flat arch,

2

but the findings were otherwise normal (Tr. 260). No edema was present (Tr. 260). Ms. Raff prescribed medication and advised Plaintiff to maintain a low-fat, low-cholesterol diet (Tr. 260). Laboratory testing showed an A1C of 11.0 (Tr. 272).

In September 2012, Plaintiff complained of worsening right foot pain for the past one to two weeks (Tr. 424). His foot was red and swollen (Tr. 424). He had decreased sensation to hot and cold in his feet, though his sensation to touch was still good (Tr. 424-25). His A1C was 11.7 (Tr. 430). An x-ray of Plaintiff's right foot showed no acute findings (Tr. 374). The next week, Plaintiff had decreased sensation and mild redness on his right foot, but no edema (Tr. 422).

In October 2012, Plaintiff's A1C was 11.7 and his blood sugars were around 200 (Tr. 420). He reported pain and swelling in his right foot; he previously had the same problem with his left foot (Tr. 420). Naproxen improved the pain (Tr. 421). Upon examination, Plaintiff had decreased sensation in his right foot and minimal edema (Tr. 420). Later that month, Plaintiff's reported blood sugars were under 200 (Tr. 417). He had worsening neuropathy in his right foot and wanted to get his diabetes controlled, but admitted to eating a lot of butter and fried foods (Tr. 417). The provider prescribed medication and encouraged diet and exercise (Tr. 418).

In December 2012, Wayne Gilbert, M.D., performed a consultative medical examination of Plaintiff (Tr. 451-53). Plaintiff alleged disability due to diabetes, pain and swelling in his feet, neuropathy, gait difficulties, decreased vision, chronic fatigue, and hypertension (Tr. 451). He walked with an antalgic gait favoring his left side due to pain in his left foot (Tr. 452). His vision with glasses was 20/50 in the right eye, 20/40 in the left eye, and 20/40 with both eyes (Tr. 452). He had cervical spine flexion to 45 degrees, extension to 50 degrees, right and left lateral flexion to 20 degrees, right lateral rotation to 45 degrees, and left lateral rotation to 60 degrees (Tr. 452). Lumbar spine flexion was complete, extension was complete, and right and left lateral flexion was complete (Tr. 452). Straight leg raise testing both seated and supine was normal (Tr. 453). Plaintiff had full range of motion in his upper extremities, shoulders, elbows, wrists, hands, and fingers (Tr. 453). Diffuse mild edema was noted in the hands and fingers, with minimally diminished finger grip of 3/5 bilaterally (Tr. 453). Plaintiff had full range of motion in his hips and knees, with the exception of flexion of the right knee, which was limited to 120 degrees (Tr. 453). There was swelling in both feet, some warmth and erythema (Tr. 453). There was tenderness under the sole of the left foot (Tr. 453). He could stand on either foot, could walk on his heels, squat down halfway and come back up, and could walk heel to toe (Tr. 453). Dr. Gilbert assessed poorly controlled diabetes associated with peripheral neuropathy and retinopathy (Tr. 453). He stated that Plaintiff at that time had significant pain in his feet and would be limited in walking to 50 yards, standing to 15 minutes (Tr. 453). He could lift or carry 30 pounds rarely (Tr. 453).

Later that month, State agency medical consultant Celia Gulbenk, M.D., opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds

3

frequently, and could stand and walk for 6 hours and sit for 6 hours during an 8-hour workday (Tr. 61). He could frequently operate foot controls with his bilateral lower extremities (Tr. 61-62). He could occasionally climb ladders, ropes, or scaffolds and could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs (Tr. 62). She opined that Plaintiff did not have any manipulative or vision limitations (Tr. 62). He was to avoid concentrated exposure to extreme heat and extreme cold (Tr. 62). She stated Dr. Gilbert's opinion was an overestimate of the severity of Plaintiff's restrictions and limitations and was based only on a snapshot of his functioning (Tr. 63).

In January 2013, Plaintiff reported his right foot felt somewhat better, but he was having pain in his left foot and numbness up to his ankle (Tr. 469). His foot felt hot (Tr. 469). Ibuprofen helped his pain (Tr. 469). His monofilament examination was within normal limits (Tr. 469). There was mild-trace edema in his left foot, but the provider noted that Plaintiff's physical examination was normal, including his musculoskeletal examination and his extremities (Tr. 469). The provider assessed diabetic neuropathy, hyperlipidemia, foot pain, and diabetes mellitus type 2 (Tr. 470). Upon physical examination, both feet had edema and were tender and warm (Tr. 479). His A1C was 10.4 (Tr. 485).

In February 2013, Plaintiff reported pain and swelling in his feet for the past six months (Tr. 479). He stated he was unable to bear weight on both feet (Tr. 479). He also reported tingling in both feet (Tr. 479).

Plaintiff sought medication refills in March 2013 (Tr. 477). His physical examination was normal (Tr. 477). X-ray of his ankle showed a normal ankle joint, midfoot malalignment, consistent with Charcot's joint, benign fibrous cortical defect within the distal tibia, and moderate calcaneal spurring (Tr. 488). Imaging of the left foot showed Lisfranc deformity of the midfoot with pes planus (Tr. 490). Imaging of the right foot showed Lisfranc dislocation of the tarsometatarsal joints, suggesting Charcot's joint (Tr. 491).

On May 21, 2013, David Schilling, M.D., and Thelma Falin, R.N., completed a letter on Plaintiff's behalf (Tr. 492). They indicated Plaintiff was being treated for type 2 insulin-requiring diabetes, high blood pressure, and peripheral neuropathy with the diabetes being difficult to control (Tr. 492). Plaintiff had been diagnosed with significant diabetic retinopathy and was currently undergoing treatments to prevent blindness (Tr. 492). Plaintiff's diabetes damaged the nerves in his legs and feet and caused severe pain, constant burning, and numbness in his lower extremities (Tr. 492). The nerve damage caused bone structure changes in both feet (Charcot's joint disease), which made it difficult for Plaintiff to keep his balance when walking and required him to walk with crutches or a cane (Tr. 492). Plaintiff had frequent falls (Tr. 492). They concluded that Plaintiff "was no longer able to work at a job due to the above stated medical conditions" (Tr. 492).

Also in May 2013, on reconsideration, State agency medical consultant Kanika Chaudhuri, M.D., opined that during an 8-hour workday, Plaintiff could lift and carry 25 pounds occasionally and 10 pounds frequently, stand or walk for

4

about 6 hours, and sit for about 6 hours (Tr. 86). He could frequently operate foot controls (Tr. 86). He could occasionally perform postural maneuvers, including the ability to balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes and scaffolds (Tr. 86-87). He was to avoid concentrated exposure to extreme cold and extreme heat (Tr. 87). The State agency medical consultant gave no weight to Dr. Gilbert's opinion as the findings at the consultative medical examination, including antalgic gait and swelling in hands, were not noted elsewhere in the medical records (Tr. 88). Although Plaintiff alleged worsening vision, there was no support for that in the medical records (Tr. 88).

In September 2013, Plaintiff had a six-month diabetic check (Tr. 514). He had not been following his diet, and the provider recommended lifestyle changes (Tr. 514). In October 2013, Plaintiff reported he had been taking his insulin more consistently (Tr. 513). The provider instructed Plaintiff to continue all medicines as prescribed and reinforced the importance of controlling blood sugar (Tr. 512). Recommendations included no sugar, a low fat diet, and monitoring the amount of carbohydrates (Tr. 512).

At the end of October 2013, Plaintiff was admitted to the hospital overnight with right facial weakness and numbness, and left hand numbness (Tr. 531). Physical examination showed obvious right facial palsy (Tr. 533). Both upper extremity and lower extremity powers were 4-5/5 (Tr. 534). Sensation was intact except for some numbness on the left hand fingertips (Tr. 534). A computed tomography (CT) scan of Plaintiff's head was normal (Tr. 522). Diagnostic imaging of his chest was unremarkable (Tr. 523). A brain magnetic resonance imaging (MRI) scan was normal (Tr. 526). The doctor dismissed Plaintiff the next day on a trial of oral prednisone and Valtrex (Tr. 531).

In November 2013, Plaintiff followed-up with Dr. Schilling after his hospitalization (Tr. 511, 528-30). The brief physical examination was normal, except that Plaintiff's right side of his face was sagging, with essentially no movement (Tr. 529). Dr. Schilling assessed Bell's palsy, diabetes mellitus type 2, uncontrolled, and diabetic Charcot foot (Tr. 529-30). Plaintiff returned to Church Hill in December 2013 (Tr. 509-10). He complained of foot and leg pain at night and was noted as having an obvious droop in the right side of his face and eye lid (Tr. 510).

Plaintiff submitted additional records only to the Appeals Council. On April 25, 2014, Plaintiff was evaluated at the Regional Eye Center for a diabetic examination (Tr. 589-91). Following examination, the provider assessed background retinopathy OU, dermatochalasis OU, Bell's palsy, and presbyopia OU (Tr. 590-91). Although Plaintiff complained of decreased visual acuity in both eyes, his vision was 20/25 in the right eye and 20/40 in the left eye (Tr. 589). The provider emphasized blood sugar control to Plaintiff, and indicated he would continue to observe Plaintiff's condition and symptoms (Tr. 590-91). He gave Plaintiff a prescription for new glasses (Tr. 591).

On August 4, 2014, Dr. Schilling completed a Physical Residual Functional Capacity Questionnaire on behalf of Plaintiff (Tr. 581-85). He

5

diagnosed type 2 insulin dependent diabetes – poorly controlled; bell palsy, peripheral neuropathy; diabetic retinopathy; and bilateral foot and ankle deformity (Charcot's joint), and neuropathy (Tr. 581). His symptoms included numbness in the left hand, right side of the face, lower legs, and feet; poor balance; frequent falls; decreased vision; needing thick glasses, special shoes, and a cane in order to walk (Tr. 581). Plaintiff had constant burning and aching pain in his lower legs (Tr. 581). Clinical findings and objectives signs supporting these conditions were noted as Charcot's foot disease by x-ray, Bell's palsy by neurology, and retinopathy-eye disease by ophthalmology (Tr. 581). Plaintiff had depression and that his pain constantly interfered with the attention and concentration needed to perform even simple work tasks (Tr. 582). He was incapable of even low stress jobs (Tr. 582).

    Dr. Schilling opined that Plaintiff could sit for 45 minutes to 2 hours at a time and 6 hours total and could stand for 10 minutes to 1 hour at a time and less than 2 hours total (Tr. 592-83). He needed a job where he could shift at will, needed unscheduled breaks, and needed to elevate his legs (Tr. 583). He had to use a cane or other assistive device to walk due to poor balance (Tr. 583). He could rarely lift up to 50 pounds (Tr. 583). Dr. Schilling further opined that Plaintiff could rarely look down, turn his head right or left, look up, or hold his head in a static position (Tr. 584). Plaintiff could rarely twist, stoop (bend), crouch/squat, climb ladders, or climb stairs (Tr. 584). He could only use his right hand, fingers, or arm 10 percent of the day, and could never use his left hand, fingers, or arms (Tr. 584). Plaintiff had good days and bad days and would be absent from work more than four days per month (Tr. 584).

[Doc. 17, pgs. 2-9].

On April 14, 2014, at the administrative hearing, the ALJ called Cathy D. Sanders, a vocational expert ["VE"] to testify. He asked her to assume a person of plaintiff's age, education, and past work experience who could perform light work with a sit/stand option; who could only occasionally use foot controls bilaterally; who could only occasionally engage in postural activities; who could not climb ropes, ladders or scaffolds; and who must avoid concentrated exposure to extreme heat and cold and hazards. She identified several jobs in the state and local economies which such a person could perform (Tr. 53). However, the hypothetical which followed is the one the ALJ

6

relied upon in his hearing decision. He asked the VE to assume the same person with the same restrictions, except without the sit/stand option and a limitation to sedentary exertion. She identified the jobs of document sorter, with 800 in Tennessee and 25,000 in the nation; office assistant, with 1,000 in Tennessee and 101,000 in the nation; and receptionist, with 1,100 in Tennessee and 87,000 in the nation. (Tr. 54).

On May 29, 2014, the ALJ rendered his hearing decision. He first described the five step evaluation process which must be followed in these cases. He found that the plaintiff had not engaged in any substantial gainful activity since his alleged disability onset date of July 20, 2012. He found that the plaintiff had severe impairments of diabetes mellitus, peripheral neuropathy, and Charcot's joint disease (Tr. 29).[1]

The ALJ then found that none of these severe impairments, either alone or in concert, met or equaled one of the listed impairments in 20 CFR Part 404, Subpart P.

---

[1] Charcot's joint disease, or "Charcot's Foot," is described as follows:

> a complication of diabetes that almost always occurs in those with neuropathy (nerve damage)." *See* Charcot's Foot, available at http://www.epodiatry.com/charcot-foot.htm (last visited on July 7, 2010). Charcot's arthropathy causes the bones in the foot to "become weakened" and "fracture easily, even without there being any major trauma." Also, the muscles in the foot "lose their ability to support the foot correctly." Because those suffering from this condition experience a decreased ability to sense pain, minor trauma to the foot often goes undetected and untreated which "leads to slackness of the ligaments (laxity), joints being dislocated, bone and cartilage being damaged" and "severe deformities of the foot."

*Snyder v. Comm'r of Soc. Sec.*, No. 1:09-CV-774, 2010 WL 3808377, at *3 (W.D. Mich. July 30, 2010), *report and recommendation adopted sub nom. Snyder v. Com'r Sec.*, No. 1:09-CV-774, 2010 WL 3810048 (W.D. Mich. Sept. 23, 2010).

Appendix 1. He particularly considered listings relating to the musculoskeletal system, endocrine system, and nervous system. (Tr. 30).

He then opined as to the plaintiff's residual functional capacity ["RFC"]. In that regard, the ALJ stated that the plaintiff had the RFC to perform sedentary work as defined in the regulations, "except the claimant can only occasionally use foot controls bilaterally and perform postural activities. However, he must avoid climbing of ropes, ladders, and scaffolds, and concentrated exposure to extreme temperatures, humidity, and hazards." (Tr. 30). In that regard, the ALJ stated that because of his conditions, the plaintiff alleged symptoms of pain in his lower extremities, bleeding behind his eyes, decreased vision, and edema, and said he thus had difficulty with prolonged standing, walking, climbing stairs, driving and performing postural activities. The ALJ then stated that plaintiff still handled his personal needs when he first filed for benefits, but that later reports indicated that he now had trouble performing most such activities. (Tr. 30-31).

The ALJ noted that the plaintiff testified at the hearing that his symptoms were worsening, and that he used a cane to ambulate. Plaintiff said the numbness in his lower extremities which led to his Charcot joint disease was now affecting his upper extremities, and that he now experienced facial paralysis due to Bell's Palsy. While the ALJ acknowledged that plaintiff's impairments could cause his reported symptoms, he found that the plaintiff was not entirely credible. (Tr. 31).

The ALJ then discussed the medical evidence, first stating that "the objective findings in this case fail to provide strong support for the claimant's allegations of

8

disabling symptoms and limitations." (Tr. 31). Particularly, the ALJ felt that the RFC finding accounted for all of plaintiff's existing limitations. He noted plaintiff's treatment in September 2012, which showed a decrease in his blood pressure and x-rays which showed "no significant abnormal findings." In October 2012, other treatment records showed that although plaintiff's blood glucose levels were far above normal, plaintiff smoked a pack of cigarettes a day and admitted "consuming a lot of butter and fried foods." (Tr. 31). Plaintiff was advised to cease all of this. Those October treatment records "only noted abnormal findings…" with regard to right lower extremity, which nevertheless had a full range of motion. (Tr. 31).

He then discussed the findings of the consultative exam by Dr. Gilbert. Dr. Gilbert found 20/40 vision, reduced grip strength, full strength in all extremities, swelling in the lower extremities, the ability to stand on either foot, etc. He also noted that plaintiff's hypertension was controlled even with his smoking. Dr. Gilbert noted that the plaintiff's diabetes was poorly controlled with peripheral neuropathy and retinopathy. He stated the plaintiff could rarely lift up to 30 pounds, walk up to 50 yards and stand for up to 15 minutes. The ALJ stated that "no treating physician had offered an opinion sufficient upon which to assess the claimant's residual functional capacity." (Tr. 32). But, the ALJ noted that evidence subsequent to Dr. Gilbert's exam "clearly shows that the claimant is only capable of work at a reduced range of the sedentary exertional level." (Tr. 32). Accordingly, he gave "less than significant weight" to the opinion of Dr. Gilbert. (Tr. 32).

9

Records from the health department in January 2013 showed plaintiff was controlling his blood sugar better, with the level "only in the 180's." (Tr. 32). Plaintiff continued to complain of left foot pain and numbness. The ALJ noted the records indicated plaintiff did not appear for a foot evaluation appointment and insisted this non-compliance "indicates that the claimant is not serious about his health or that his symptoms do not rise to a level as to motivate the claimant to follow up with recommended treatment." (Tr. 32). The ALJ then stated that records from February, 2013 showed bilateral edema and tenderness in plaintiff's feet, which led the ALJ to believe "if the claimant had not been non-compliant with his recommended treatment maybe his symptoms would not have been exacerbated." (Tr. 32).

In March 2013, plaintiff complained to the health department about his financial issues. The ALJ found "it interesting that he was still able to afford his expensive chronic tobacco smoking habit." (Tr. 32). The ALJ stated the exam was "unremarkable." However, he noted x-rays showed serious effects of the Charcot's joint disease in plaintiff's feet. The ALJ stated that plaintiff was told to cease all tobacco use and that he was being noncompliant with his prescribed diet. (Tr. 32).

The ALJ discussed the May 2013 letter from Dr. Schilling, plaintiff's treating physician, and Thelma Falin, Dr. Schilling's nurse, of Church Hill Free Clinic, regarding the plaintiff, described in the medical record synopsis above. The ALJ found that those opinions "are not supported by the objective clinical findings and is inconsistent with other substantial evidence (i.e. the claimant's countless unremarkable examinations)."

10

(Tr. 33). The ALJ's had significant trouble with the opinion of Dr. Schilling and Nurse Falin that plaintiff could not work, noting that this was an area reserved to the Commissioner. Thus, he found that their opinion was "unsupported and involve an issue reserved for the Commissioner." *Id.* Accordingly, he assigned their opinion no significant weight (Tr. 33).

The ALJ then noted that plaintiff was admitted to Indian Path Medical Center for right facial weakness and numbness. Objective imaging was unremarkable. No extremity swelling or tenderness was noted, and plaintiff's glucose level was 178. He was diagnosed with Bell's palsy. It was noted plaintiff still smoked his pack of cigarettes per day. The ALJ stated a follow up visit showed a normal blood pressure and an exam that "was essentially unremarkable." (Tr. 33).

Finally, the ALJ noted a medical record from Church Hill Free Clinic in 2014 which showed plaintiff's diabetes uncontrolled, and that plaintiff had gained 20 pounds in spite of the Clinic's prescribed dietary restrictions. Plaintiff's glucose level was 212. (Tr. 33).

The ALJ found from all of this that "there is no indication he would not be able to return to work at the sedentary exertional level." (Tr. 34). He pointed to the gap between March and October 2013 in the treatment records, other than a six-month diabetes exam in September. The ALJ stated "the record reflects that the claimant has demonstrated that when necessary, he is willing to take some initiative towards obtaining medical treatment, even though none of his conditions had been preventing him from working." (Tr. 34). He

11

therefore found that complaints of pain and other symptomology were "disproportionate to the objective medical findings and are not credible…" except to the extent of the RFC he found. (Tr. 34). The ALJ also stated that the plaintiff's yearly earnings prior to the alleged onset date showed "a pattern of low and inconsistent earnings." (Tr. 34). He therefore found that the "earnings record detracts from his credibility and shows a poor work history." *Id.* He said that "a lack of consistent work history may indicate a lack of motivation to work rather than a lack of ability." *Id.*

Although the plaintiff could not return to any past relevant work, based upon the opinion of the VE, he found that there were a substantial number of jobs the plaintiff could perform. Accordingly, the ALJ found plaintiff was not disabled. (Tr. 34-36).

Plaintiff asserts that the ALJ erred (1) in failing to properly evaluate and consider all of the plaintiff's impairments; (2) in failing to properly evaluate the opinion of the plaintiff's treating physician, Dr. Schilling; and (3) in failing to properly evaluate the opinion of the consultative examining physician, Dr. Wayne Gilbert.

Dr. Gilbert examined the plaintiff on November 29, 2012. He observed a number of "normal" findings in his exam. He noted mostly normal musculoskeletal findings, including normal extension and flexion of the lumbar spine, normal straight leg raising, and a full range of motion in the upper extremities, including the wrists and elbows. He noted diffuse mild edema, and minimally diminished finger grip 3/5 bilaterally. With the exception of the finger grip, he found strengths in all major muscle groups of 4 to 5/5. In the lower extremities he found a full range of motion at the knees except for the right

knee which was limited to 120 degrees. He noted swelling of both feet with tenderness under the sole of the left foot. The plaintiff could walk on his heels, walk on his toes, heel and toe walk, and squat down to 50% and rise back up. He opined that the plaintiff could walk up to 50 yards and stand for 15 minutes. He said the plaintiff could rarely lift or carry 30 pounds. Although he had the medical records up to that time, he, of course, did not have the later records from treating sources (Tr. 451-453).

The ALJ's evaluation of the "less than significant weight" he gave to Dr. Gilbert is somewhat confusing. The ALJ indicated that because Dr. Gilbert's assessment came early in the progression of plaintiff's disease, he could not develop an accurate picture of the plaintiff's condition at the time the ALJ was writing his decision. He then stated that the later evidence "clearly shows that the claimant is only capable of work at a reduced range of the sedentary exertional level." (Tr. 32). It is unclear exactly what Dr. Gilbert's overall opinion of the plaintiff's exertional capabilities was. Plaintiff asserts that the ALJ mistakenly concluded that the plaintiff was more limited than the ALJ's RFC finding said that he was. In all honesty, we do not know because of Dr. Gilbert's lack of specificity. For example, he opined that the plaintiff could lift up to 30 pounds, but "rarely." Also, he gave no indication of how many times in a workday that the plaintiff could walk up to 50 yards or stand for 15 minutes. The lifting range certainly would exceed sedentary work if the plaintiff could lift 10 pounds frequently and rarely lift 30 pounds. An unspecific opinion led to a somewhat unclear opinion on it by the ALJ. It is clear though that the ALJ knew exactly what Dr. Gilbert's report contained. In any event, the opinion

13

of a consultative examiner, unlike that of a treating doctor, is "entitled to no specific degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

With respect to Dr. Schilling, his only opinion before the ALJ was the letter of May 21, 2014. It is true, of course, that a further evaluation and opinion from Dr. Schilling was presented to the Appeals Council (Tr. 581). However, the Appeals Council, after reviewing this evidence, stated that "[t]his new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before May 29, 2014." (Tr. 2). Thus, the August RFC assessment was considered by the Appeals Council, but it determined that it only provided an opinion on plaintiff's condition subsequent to the ALJ's hearing decision of May 29. In such a circumstance, the Sixth Circuit has held "that where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996)(citing *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993)).

The Appeals Council in the present case did consider the evidence in the record in the plaintiff's case, including Dr. Schilling's May 21, 2013 letter, (Tr. 492), and declined to review the ALJ's decision. At that point, this Court, under *Cline, supra*, could not consider Dr. Schilling's August 7, 2014 assessment in deciding whether the ALJ's opinion should be affirmed or modified or reversed. However, as pointed out in *Cline*,

14

the Court could consider whether to remand the case under sentence six of 42 U.S.C. § 405(g).  However, to do this the Court must find that the evidence not presented to the ALJ was new and material, and that there was good cause for not presenting it to the ALJ.  See, *Cline, supra*, at 148.

The report submitted to the Appeals Council appears to be only a more detailed assessment of the conditions contained in the May 21, 2013 letter.  If it is intended to show a worsening of the conditions, then it is not material because it applies to a later time period.  However, if it is meant to apply to the time period prior to the ALJ's hearing decision, then this Court sees no good cause for it not having been prepared and submitted for the ALJ's consideration.  A remand under Sentence 6 is not warranted by this questionnaire.

The question of whether the ALJ erred in rejecting Dr. Schilling's May 21, 2013 letter (Tr. 492) must now be addressed.  In the letter, Dr. Schilling described plaintiff's diabetes, hypertension, peripheral neuropathy, and Charcot's joint disease.  He described the physical effects, particularly plaintiff's pain and difficulty maintaining balance without a cane.  He concluded that plaintiff could no longer work due to those conditions.

The ALJ is required to give controlling weight to treating physicians under 20 C.F.R. §§ 404.1527(c)(2), and 416.927(c)(2).  For this requirement to attach, however, the opinion of the treating source must be well-supported by acceptable clinical and laboratory diagnostic techniques and not be inconsistent with the other substantial evidence in the record.  However, an opinion that the physician's patient cannot work is

15

not a medical opinion and is never entitled to controlling weight, although it must be considered by the ALJ. The ultimate question of whether a person can work or not is reserved to the Commissioner, and a treating doctor's opinion in that regard is entitled to no particular deference. With respect to that aspect of Dr. Schilling's letter, that is the case here.

The ALJ considered all of Dr. Schilling's findings and opinions. With regard to his actual medical opinions, the ALJ found that they were not well-supported. He noted that, other than abnormal findings relating to plaintiff's Charcot's joint disease, mild edema, and some vision difficulties corrected with glasses the majority of plaintiff's exams were unremarkable as described hereinabove. Outside of the lower extremities, range of motion studies and strength in major muscle groups were consistently normal. He noted gaps in the treatment record, non-compliance with suggested treatment, and a lack of evidence to support the assertion that plaintiff frequently fell. Regarding his diabetic retinopathy, Dr. Gilbert noted that the plaintiff had 20/40 vision with both eyes and that extraocular movements were intact. (Tr. 451-452). Dr. Gilbert imposed no visual limitations. Also, there were no records before the ALJ to support Dr. Schilling's claim that the plaintiff was undergoing treatment for significant retinopathy. The ALJ also noted the conservative treatment history. Regarding Dr. Schilling's opinion that plaintiff was not capable of working, the ALJ correctly noted that it was his burden to decide that issue.

The conclusions in Dr. Schilling's letter are not supported to the extent that they

16

are entitled to controlling weight. Also, the ALJ adequately stated his reasons for the low weight he gave Dr. Schilling's medical opinions.

With regard to plaintiff's assertion that the ALJ failed to properly consider all of the plaintiff's impairments in his RFC finding, plaintiff states that the opinions of Dr. Schilling and Dr. Gilbert along with the plaintiff's allegations show a lack of substantial evidence to support the RFC finding. As stated above, other than the problems with his feet, the RFC adequately addresses any other impairments the plaintiff asserts he has.

However, the issue of the extent to which the plaintiff's Charcot joint disease affects his ability to work appears to be unanswered from a medical standpoint. In this regard, the ALJ did not assign any substantial weight to any physician. Dr. Gilbert, Dr. Schilling and Dr. Chaudhuri, the State Agency non-examining physician were all given little weight, albeit for different reasons. He rejected the opinion of Dr. Schilling as overly restrictive. To an extent at least, the ALJ held that Dr. Gilbert was not restrictive enough in light of evidence that was not before Dr. Gilbert at the time he did his examination. Regarding Dr. Chaudhuri, the ALJ stated that he "did not have the benefit of reviewing all of the evidence subsequently made part of the record. The evidence from treating and examining doctors confirms that the claimant has been far more significantly limited since the alleged onset date." Therefore, the ALJ gave little weight to that opinion. (Tr. 34).

The problem is, the plaintiff's Charcot's joint disease appears from the records to have gotten progressively worse, and that was the ALJ's reason for rejecting Dr.

17

Gilbert's, and particularly Dr. Chaudhuri's, opinions. Dr. Schiller's opinion appears at the other extreme, and his opinion was also rejected.

The Court believes it to be true that no medical opinion has to completely consistent with an ALJ's RFC determination for that RFC finding to be based on substantial evidence. Here, however, it is objectively confirmed that the plaintiff has Charcot's joint disease, which is a severely limiting condition which could well be disabling, depending on the medical proof. The ALJ may have been correct in his assessment of plaintiff's credibility. But in this regard, the plaintiff's earlier complaints have been followed by an eventual undisputed diagnosis that he has a disease which accounts for those complaints. The Court finds that under the circumstances of this case, an examining physician with access to all the medical records should opine as to the plaintiff's functional capacity. That is lacking in this case. The ALJ making his RFC finding based entirely on old records and the plaintiff's perceived lack of credibility was not substantially justified.

To be sure, the Court does not see evidence which conclusively shows one way or the other that the plaintiff is, in fact, disabled. More assessment is needed. But given the circumstances present in this case, it is respectfully recommended the case be remanded to the Commissioner for such an examination to take place and the record to be further developed. Accordingly, it is further recommended that the plaintiff's Motion for Summary Judgment [Doc. 13] be GRANTED, and the Commissioner's Motion for

Summary Judgment [Doc. 16] be DENIED.[2]

Respectfully submitted,

       s/ Clifton L. Corker
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).